IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01584-PAB-MEH

JEREMY NECHOL DENISON,

      Plaintiff,

v.

CORRECTIONAL HEALTH PARTNERS, Utilization Mgmt Comm.,
NEAL LOUSBERG, CSP Medical Provider, and
KATHLEEN BOYD, CSP Medical Provider,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court is Defendant Correctional Health Partners' Motion for Summary Judgment [filed December 5, 2014; docket #101] and the Motion for Summary Judgment filed by Defendants Boyd and Lousberg ("CDOC Defendants") [filed December 5, 2014; docket #103].  The motions have been referred to this Court for recommendation (docket #106), and the Court finds that oral argument will not assist in the adjudication of the motions.  Based on the record herein and for the reasons that follow, the Court RECOMMENDS that Defendants' motions be **GRANTED**.[1]

---

[1] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72.  The party filing objections must specifically identify those findings or recommendations to which the objections are being made.  The District Court need not consider frivolous, conclusive or general objections.  A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations.  *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the

## BACKGROUND

Plaintiff initiated this lawsuit pursuant to 42 U.S.C. § 1983 as a *pro se* litigant currently incarcerated in the Arkansas Valley Correctional Facility.  Plaintiff filed the operative complaint on June 17, 2013.  (Docket #1.)

## I.    Procedural History

In essence, Plaintiff alleges that Defendants breached a settlement agreement and deprived him of his Eighth Amendment rights against cruel and unusual punishment by Defendants' deliberate indifference to Plaintiff's serious medical needs.  Complaint, docket #1.  Specifically, as to the remaining individual Defendants, Plaintiff alleges Boyd refused in August 2012 to request approval for an MRI previously recommended and approved for Plaintiff's back problem, and Lousberg improperly discontinued the Gabapentin prescribed for Plaintiff's back problem in July 2012.  *Id.*  Plaintiff also contends that Correctional Health Partners ("CHP") improperly denied or delayed a recommended MRI in September 2011.  *Id.*  Plaintiff requests compensatory and punitive damages as relief against the Defendants jointly and severally, and a declaration that Defendants violated Plaintiff's Eighth Amendment rights by failing to provide adequate medical care and by failing to properly investigate Plaintiff's grievances.  *Id.* at 15-16.

Following discovery on the remaining claims, Lousberg and Boyd filed a motion for summary judgment arguing no material facts are in dispute as to whether Boyd breached the settlement agreement and whether Lousberg and Boyd violated the Eighth Amendment.  Further, Boyd and Lousberg claim they are entitled to qualified immunity. Defendant CHP also filed a

---

Magistrate Judge that are accepted or adopted by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *In re Garcia*, 347 F. App'x 381, 382-83 (10th Cir. 2009).

motion for summary judgment arguing Plaintiff cannot demonstrate any constitutional violations or that CHP promulgated a custom, policy or practice that violated Plaintiff's rights.   Although provided an opportunity to respond within the established briefing period, as well as permitted two extensions of time within which to respond by this Court (dockets ## 113, 118), the Plaintiff did not timely file responses to the present motions.[2]

## II.     Findings of Fact

The Court makes the following findings of fact viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.[3]

1.      In connection with Plaintiff's complaints of back pain during his incarceration, Plaintiff underwent an MRI examination in 2006.   MRI Results, January 27, 2006, docket #110-1 at 39.

2.      The results of the 2006 MRI examination showed a protrusion present at L4-L5 causing moderate to severe spinal stenosis.   There was narrowing of the left lateral recess and neural foramen without definitive nerve root impingement.    At L5-S1, there was a large disk protrusion that appeared to impinge on the left L5 nerve root laterally, and moderate spinal stenosis.   The diagnosis was degenerative disc disease with spinal stenosis at L4-L5 and L5-S1, left L5 nerve root

---

[2]The Plaintiff sought a third extension of the response deadline on March 12, 2015, 31 days after the February 9, 2015 deadline.  This Court denied the motion for lack of good cause and any explanation of excusable neglect.  Docket #121. Nevertheless, on March 17, 2015, the day on which the Court was prepared to issue this Recommendation, the Plaintiff filed a response brief with attached exhibits and an "affidavit." Docket #122. Although not necessary given its previous order, the Court reviewed Plaintiff's briefing and has determined Plaintiff raises no genuine issues of material fact as to the remaining claims against Boyd, Lousberg and CHP.

[3]Typically, in the summary judgment context, a pro se litigant's verified complaint may be treated as an affidavit as long as it satisfies the standards for affidavits outlined in Rule 56.  *See Adams v. Dyer*, 223 F. App'x 757, 764 n.7 (10th Cir. 2007) (citing *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988)).

impingement laterally.  *Id.*

3.      Treatments for this condition can include: education about the course of the condition and how to relieve symptoms; medicines to relieve pain and inflammation, such as acetaminophen and nonsteroidal anti-inflammatory drugs (NSAIDs); exercise (to maintain or achieve overall good health); aerobic exercise; weight loss (to relieve symptoms and slow progression of the stenosis); physical therapy (to provide education, instruction, and support for self-care); instruction on stretching and strength exercises that may lead to a decrease in pain and other symptoms; epidural injections; facet injections; and, as a last resort, surgery.  Affidavit of Andrew Martinez, December 9, 2014 ("Martinez Affidavit"), ¶ 18, docket #110-1.

4.      Plaintiff was referred to a neurosurgeon, Dr. Dexter Koons, for back pain treatments, including facet block injections.

5.      On March 25, 2009, Plaintiff signed a settlement agreement with the Colorado Department of Corrections ("CDOC") regarding medical treatment for his back problems, which provides in pertinent part:

> 4.      The parties agree that Plaintiff will receive a priority appointment with Dr. Koons for a medical evaluation relating to his back problems. The parties further agree that if Dr. Koons recommends that Plaintiff receive another round of facet block injections, Defendants will approve that treatment. The parties further agree that Plaintiff will receive a priority follow-up appointment with Dr. Koons for further evaluation relating to his back problem. If Dr. Koons recommends additional medical treatment at that time, Plaintiff will pursue a request for such treatment through ordinary CDOC channels.

Draft Settlement Agreement-Confidential, docket #1 at 18; *see also* Final Release and Settlement Agreement, March 31, 2009, ¶ 15(a), docket #101-8.

6.      On April 16, 2009, Physician's Assistant ("PA") Tejinder Singh noted that he had received

4

a telephone call from CDOC staff regarding scheduling Plaintiff for an appointment with Dr. Koons pursuant to a court order/lawsuit. Ambulatory Health Record, April 22, 2009, docket #110-1 at 40.

7.      PA Singh submitted a request for approval for an appointment with Dr. Koons on April 22, 2009. Consultation Report Form, April 22, 2009, docket #110-1 at 41.

8.      The Plaintiff saw Dr. Koons on May 29, 2009, at which time Dr. Koons noted, "[facet] blocks lasted for a few days," and recommended alternate procedures for Plaintiff including a facet rhizotomy and three epidural injections for radicular symptoms. Office Visit Notes, May 29, 2009, docket #110-1 at 42.

9.      On August 5, 2009, Dr. Koons' office sent a facsimile request to Physician Health Partners, now known as Defendant Correctional Health Partners ("CHP"), seeking approval for the facet rhizotomy and three epidural injections that Dr. Koons recommended. Docket #110-1 at 44-46. The fax cover letter contains a handwritten notation by a person named April Nauman stating, "here is what I have in his chart[;] I did not see an MRI or CT report that you asked for. Call April w/any questions." *Id.* at 44. Although the fax cover letter is dated August 7, 2009 at 1:25 p.m., the documents accompanying the letter indicate handwritten notes saying they were faxed on August 5, 2009 at 11:35 a.m.; thus, the note on the cover letter was likely a response to CHP's request for additional information following the April 5, 2009 fax. *See id.*

10.     Pursuant to CDOC policies, when an outside specialist requests or recommends medical procedures such as an MRI examination, the outside specialist is responsible for requesting approval from CHP. Martinez Affidavit, ¶¶ 59-62, docket #110-1; *see also* Declaration of Yvonne Munoz, December 5, 2014 ("Munoz Declaration"), ¶ 9, docket #101-3.

11.     On August 11, 2009, Stephen Krebs, Medical Director for CHP, issued a letter to Dr. Koons

notifying him that the requested procedures had been denied because "[t]he information provided does not support the medical necessity for the service requested."  August 11, 2009 Letter from Krebs to Koons, docket #110-1 at 47.

12.     Nothing in the record indicates that Dr. Koons submitted an appeal of this denial.

13.     On January 25, 2010, Plaintiff saw provider Mary Carter at the Colorado Territorial Correctional Facility (CTCF) complaining of back pain associated with spinal stenosis. Ambulatory Health Record, January 25, 2010, docket #110-1 at 48.  Plaintiff reported that he had last been seen by Dr. Koons on May 29, 2009, at which time it had been determined that the facet block injections given in September 2008 had "failed." *Id.*  Ms. Carter noted that Plaintiff was in no obvious distress and ambulated without a limp, she observed no bowel or bladder incontinence and no foot drop, his respirations were non-labored, and he had no peripheral edema.  *Id.*  Plaintiff had been  previously prescribed Indocin, a pain medication, the prolonged use of which might have caused hypertension and renal insufficiency; accordingly, Ms. Carter ordered alternative pain medications, Tegretol and Baclofen, for Plaintiff.  *Id.*

14.     Three weeks later, on February 15, 2010, Plaintiff was treated for a corneal abrasion that he sustained playing basketball.  Ambulatory Health Record, February 15, 2010, docket #110-1 at 49.

15.     On March 8, 2010, Plaintiff again saw Ms. Carter complaining of back pain, and indicating that he wanted surgery or repeat spinal injections at that time.  Ambulatory Health Record, March 8, 2010, docket #110-1 at 50.  Ms. Carter informed Plaintiff that CHP had denied a request for additional injections on the grounds that there was no medical necessity based upon the information provided to them; Plaintiff responded that he intended to contact his attorney to have this decision overturned.  *Id.*  Ms. Carter observed no limp or obvious impairment, Plaintiff was steady on his

feet, and no bowel or bladder incontinence or foot drop; nevertheless, to alleviate his pain, Ms.

Carter ordered that his Tegretol prescription be "titrated to 400 mg q HS" and gave Plaintiff

permission to purchase neoprene supports for his knee and ankle.  *Id.*

16.     Plaintiff next saw provider Jill Olvey on April 1, 2010 at which time Ms. Olvey noted that

Plaintiff was alert and oriented x 3 and was in no acute distress, but he complained of continuing

back pain and expressed an interest in trying an epidural injection if the change to his pain

medications was not successful.   Ambulatory Health Record, April 1, 2010, docket #110-1 at 51.

Ms. Olvey conducted a spinal examination and noted no acute tenderness or point tenderness, that

his leg lift and external rotation were equal at about 45-60, and that he felt good movement as he

tried to stretch. The plan of care was to try oral steroids, increase Tegretol, change Baclofen to

Robaxin, another pain medication, and follow up in 2 to 4 weeks to consider trigger point injections.

Ms. Olvey noted that Plaintiff had seen Dr. Koons in 2009, who recommended a facet rhizotomy

that had been denied.  *Id.*

17.     According to a note prepared by Jay Balestieri, RN, Plaintiff was seen at Dr. Koons' office

on July 9, 2010 for a re-check of his spinal stenosis. Plaintiff  reported increased pain in his back

and a decreased ability to sleep.  Progress Note, July 9, 2010, docket #110-1 at 52.  At that time, the

dosage of Plaintiff's pain medication, Neurontin (also known as Gabapentin), was increased to 600

m.g. bid and it was recommended that Plaintiff undergo another MRI examination.  *Id.*

18.     There is nothing in the record indicating that Dr. Koons' office requested approval from CHP

for an MRI examination following Plaintiff's July 9, 2010 visit.  *Id.*, ¶ 63.

19.     On August 31, 2010, Plaintiff saw Ms. Olvey at which time she noted that although Dr.

Koons' office had recommended another MRI, his office had not submitted a request for approval

for an MRI to CHP.  Ms. Olvey apparently attempted to submit a request for approval for an MRI to CHP.  *Id.*, ¶¶ 64-65.

20.     However, on September 7, 2010, CHP denied this request saying, "The UMC recommends the specialist to submit the request for an MRI of the spine with notes."  Letter from CHP to CTCF, September 7, 2010, docket #1 at 23.

21.     On September 19, 2010, Plaintiff was treated for injuries to his hand that he sustained while playing soccer.  Ambulatory Health Record, September 19, 2010, docket #110-1 at 53.

22.     On or about November 4, 2010, Dr. Koons' office made a request for approval of a follow-up MRI examination.  Referral/Precertification Request Form, November 4, 2010, docket #110-1 at 54.

23.     CHP approved the request for an MRI examination on or about November 5, 2010.  CHP Utilization Review form, November 5, 2010, docket #102-3 at 3.

24.     The MRI examination was scheduled to take place on December 29, 2010.  Plaintiff was transported from the CTCF for the MRI examination on that date; however, due to some sort of miscommunication regarding the date or location of the MRI, he was not provided with an MRI at the location to which he was taken on that date.  Plaintiff was subsequently transported back to the facility and no subsequent appointment was made.  Complaint, ¶ 7, docket #1; Martinez Affidavit, ¶¶ 70-72, docket #110-1.

25.     On February 2, 2011, Plaintiff was transferred to the Colorado State Prison (CSP) and initially seen for intake by a medical care provider named Ashley Davis.  Ambulatory Health Record, February 2, 2011, docket #110-1 at 55.  Ms. Davis noted the Plaintiff had been treated for a herniated disc and had been prescribed the medications Baclofen and Gabapentin.  *Id.*

26.     On February 15, 2011, Defendant Kathleen Boyd, Nurse Practitioner ("NP"), conducted a chart review of Plaintiff's medical file on which she noted that he had been prescribed Baclofen and Gabapentin for chronic back pain and that an MRI had been approved for Plaintiff by CHP for which she would check with the scheduler about the status.  Ambulatory Health Record, February 15, 2011, docket #110-1 at 57.

27.     Following Plaintiff's request ("kite") for renewals of his medication prescriptions, Dr. Joseph Wright conducted a chart review of Plaintiff's records on March 17, 2011, and noted that Plaintiff had L5 nerve impingement with prior facet block injections, had been prescribed Baclofen and Gabapentin, and had no success with the Baclofen which was the reason to start Gabapentin. Ambulatory Health Record, March 17, 2011, docket #110-1 at 58.  Dr. Wright indicated that it was not yet time to renew Plaintiff's prescription for Gabapentin, and also noted that Plaintiff had been treated in September 2010 for injuries he sustained "WHILE PLAYING SOCCER. This may speak to the severity of his back pain."  *Id.* (emphasis in original).

28.     Dr. Richard Hodge reviewed Plaintiff's medical file on April 7, 2011, in response to Plaintiff's kites seeking the renewal of his prescriptions for Baclofen and Gabapentin.  Dr. Hodge indicated that he would renew Plaintiff's prescription for Gabapentin, but felt that Plaintiff's request for a renewal of the prescription for Baclofen had already been addressed by Dr. Wright. Ambulatory Health Record, April 7, 2011, docket #110-1 at 59.

29.     On April 11, 2011, the non-formulary committee approved the renewal of Plaintiff's prescription for Gabapentin, but noted that he was taking a high dose of this medication (1200 mg in the morning, 1600 mg in the evening) and recommended trying to reduce the dose.  Martinez Affidavit, ¶ 89, docket #110-1.

30.     On July 5, 2011, NP Boyd saw Plaintiff at his cell after receiving a kite from him stating he was having pain and cramping in his lower back and hips. Ambulatory Health Record, July 5, 2011, docket #110-1 at 61.  Plaintiff reported that he "won" a lawsuit regarding medical care for his back, stated he was "supposed to have an MRI," and asked that Baclofen be added to his prescription for Neurontin.  *Id.*  Boyd noted that Plaintiff was a well developed, well nourished male who was lying in his bed on his back when she arrived at his cell, and who got up easily and walked to the door with a steady gait and stood for an extensive interview.  *Id.*  Boyd educated Plaintiff that Baclofen was a muscle relaxant used for acute muscle spasms from acute traumatic injuries; thus, she stated her preference to increase the dosage of Neurontin from 1200 mg in the morning to 1600 mg. Plaintiff agreed to try it and to "kite" if this regimen did not work.  *Id.*  Boyd also noted she would check the results of the MRI from December 29, 2010.  *Id.*

31.     On July 18, 2011, NP Boyd conducted a chart review of Plaintiff's file and noted that the non-formulary committee recommended checking Plaintiff's serum levels for high doses of Neurontin. She also noted that Plaintiff had been scheduled for an MRI on December 29, 2010, and that she was going to check with the scheduler.  Ambulatory Health Record, July 18, 2011, docket #110-1 at 62; *see also* Complaint, ¶ 12, docket #1.

32.     On July 27, 2011, Plaintiff's blood was collected for a "Gabapentin, Serum" test, and the result showed 2.4L for "Limits" of 4.0 - 16.0.  LabCorp Report, July 29, 2011, docket #1 at 20.  A handwritten note on the document reflects, "Gapapentin dose increased to 1600 mg BID 7/5/2011." *Id.*

33.     On August 13, 2011, NP Boyd re-submitted a request for approval for an MRI of Plaintiff's neck and spine noting that Dr. Koons had originally requested the MRI, which was approved but

never performed in December 2010.  Ambulatory Health Record, August 13, 2011 and Consultation

Report Form, August 13, 2011, docket #110-1 at 63-64.  Providers are required to obtain pre-

authorization for outside services, such as surgical procedures or an MRI, from CHP.  Munoz

Declaration, ¶ 8, docket #101-3.

34.     However, on September 7, 2011, Boyd's request was denied by CHP, which requested "notes

with a physical exam[ination]."  CHP Utilization Review form, September 7, 2011, docket #102-3

at 4; *see also* Deposition of Jeremy Denison, October 20, 2014 ("Denison Depo"), 103: 2-25, 104:

1-22, docket #101-2.  Boyd felt that, based on her observations of Plaintiff, there was nothing more

she could do regarding seeking an MRI for him, and could not justify an additional request for an

MRI on her own.  Affidavit of Kathleen Boyd, December 2, 2014 ("Boyd Affidavit"), ¶ 47, docket

#103-3.

35.     The Plaintiff saw NP Boyd again on January 28, 2012 for his kite seeking an increase in

Gabapentin "since I can't have Baclofen."  Plaintiff reported his back pain was pretty well controlled

with Neurontin, but still had pain at night, so requested an increase in the dosage of Gabapentin in

the evening.  Boyd noted that Plaintiff was a well developed, well nourished male who was lying

in his bed in no apparent distress, and who sat up and walked to the door of his cell with a normal

steady gait.  She told Plaintiff she would increase his Gabapentin to 1800 mg in the evening, but

advised him he was near the maximum allowable dosage.  Ambulatory Health Record, January 28,

2012, docket #110-1 at 65.

36.     On April 2, 2012, PA Lousberg conducted a chart review and noted that Plaintiff was due

for a renewal of his Gabapentin prescription, which he submitted.  Ambulatory Health Record, April

2, 2012, docket #110-1 at 66.

37.     On May 31, 2012, Plaintiff was seen by PA Lousberg in response to Plaintiff's kite asking to "discuss problems with medication."   Plaintiff reported he wanted to increase the Gabapentin, because he stated he felt a higher dose would be more effective to help with his back pain and sciatica.  Lousberg noted no change in Plaintiff's symptoms nor new onset of symptoms, that Plaintiff was a 37-year-old, healthy looking male who ambulated well with a steady gait, but exhibited a slight limp on his left lower extremity, that Plaintiff was alert and oriented 3x, he was in no acute distress, and his skin was dry and pink.  Lousberg agreed to increase the dosage of Gabapentin, but advised Plaintiff that he was at the maximum dosage. Plaintiff understood and agreed with this plan of care. Ambulatory Health Record, May 31, 2012, docket #110-1 at 68.

38.     On July 25, 2012, at Dr. Hodge's request, Plaintiff's urine was collected for a "Microalbumin/Creatnine Ratio" test; the test results appear to be within the limits noted on the document.  LabCorp Report, July 26, 2012, docket #1 at 21.

39.     On July 29, 2012, Nurse Dianne Ferguson noted that a correctional officer had found a "paper" with approximately "30 cc of dried white powder" on the Plaintiff and brought it "to Medical for identification."  Plaintiff told the officer, "it is my medication, cuz medical forgets to bring it."  The nurse noted that Plaintiff had "received 600 mg 3 tablets BID of neurontin floated" and the medication found had the "appearance of neurontin crushed."  She determined Plaintiff was possibly "hoarding" the medication and referred the matter to the Provider.  Ambulatory Health Record, July 29, 2012, docket #110-1 at 69.

40.     Plaintiff has a documented history of substance abuse, including use of cocaine and methamphetamines.  Gabapentin/Neurontin is a medication that can be abused by snorting, and it is very popular among offenders for that reason.  When an offender is caught hoarding Neurontin,

the likelihood is that the offender is abusing the medication by snorting it, or saving it to barter with other offenders who abuse it in this manner.  Martinez Affidavit, ¶ 113, 114, 116, docket #110-1.

41.     Neurontin is  "crushed and floated" in order to deter abuse by hoarding and, in the event of hoarding, discontinuation of the medication may be appropriate and is at the provider's discretion. *Id.* at ¶ 115.

42.     On July 30, 2012, PA Lousberg ordered that the Neurontin be discontinued due to "nursing reports pt hoarding neurontin" and because it was a non-essential medication.  Ambulatory Health Record, July 30, 2012, docket #110-1 at 70.

43.     On August 1, 2012, at Dr. Hodge's request, Plaintiff's blood was collected for a "Comp. Metabolic Panel"; the test does not appear to include a Gabapentin, Serum test and the test results primarily appear to be within the limits noted on the report.  A handwritten note on the document reflects, "Gabapentin D/C'd [discontinued] 7/3/12."  LabCorp Report, August 1, 2012, docket #1 at 22.

44.     In response to Plaintiff's kite asking "to discuss the situation with my meds and reinstating them," NP Boyd saw Plaintiff on August 6, 2012, at which time Plaintiff informed Boyd "he was not getting his meds in visiting, it's hard to sit all day in visiting with back pain, [so] he saved the medication to take in visiting"; he also repeated he had "won a lawsuit" against the CDOC "to have an MRI and to get surgery on his back," and complained that his kidney function had deteriorated from taking long term Indocin.  Boyd advised Plaintiff that "abuse of medication resulted in discontinuing the Neurontin" and "submit a grievance."  Ambulatory Health Record, August 6, 2012, docket #110-1 at 71; *see also* Complaint, ¶ 17, docket #1.

45.     On August 20, 2012, PA Lousberg denied Plaintiff's grievance complaining about the

discontinuation of the Neurontin "due to pt's abuse." Ambulatory Health Record dated August 20, 2012, docket #110-1 at 72; *see also* Complaint, ¶ 18, docket #1. Lousberg also denied reinstatement of the medication due to his observations of Plaintiff's physical abilities and instances in the record demonstrating Plaintiff's ability to play sports, such as soccer. Affidavit of Neal Lousberg, December 4, 2014 ("Lousberg Affidavit"), ¶ 49, docket #103-4.

46.     On August 22, 2012, Plaintiff was seen by Dr. Mark Wienpahl in response to Plaintiff's request to discuss the reinstatement of Gabapentin "for his chronic pain." Plaintiff informed Dr. Wienpahl that the pain was worse since the discontinuation of Gabapentin, that he had been in pain for several years, and that he had won a lawsuit against the CDOC entitling him to see a specialist, who could do nothing without a new MRI. Dr. Wienpahl discussed alternative pain medications with Plaintiff, including Carbamazepine (also known as Tegretol), which Plaintiff was willing to try; accordingly, Dr. Wienpahl prescribed 400 mg daily of Carbamazepine for Plaintiff. Dr. Wienpahl noted that he also discussed with Plaintiff that a blood test on "7/27," at which time Plaintiff was prescribed "3600 mg of the medication daily," showed "very low" levels of Gabapentin. Further, Dr. Wienpahl noted, "The serum blood level in chart dated as drawn 7/27, but received in lab 7/28 was 2.4 (nl tx range is 4.0-16.0). This would suggest noncompliance with the prescribed dose of 3600 per day he was receiving." Ambulatory Health Record, August 22, 2012, docket #110-1 at 73.

47.     The only document in the record matching Dr. Wienpahl's description of the blood test result for Gabapentin, Serum is the LabCorp Report from July 27, ***2011***. *See* docket #1 at 20. At that time, Plaintiff had been taking 2800 mg of Gabapentin daily and the dosage was increased to 3200 mg daily as of July 5, 2011. Ambulatory Health Record, July 5, 2011, docket #110-1 at 61.

48.     Plaintiff saw Dr. Richard Hodge on September 20, 2012, for a re-check of his lower back

14

pain and sciatica. Plaintiff reported that previously he had trigger point injections which helped for a time, and he had been to a specialist who performed a facet block that did not help. Plaintiff told Dr. Hodge that the specialist wanted another MRI before he would intervene again, but the second MRI was not performed. Plaintiff complained of lower back pain, especially at the sacroiliac joint and buttocks, with radiation of pain into the right lower extremity, as opposed to the left lower extremity where the pain initially radiated. Plaintiff reported that the Tegretol changed the pain from sharp to achy, and that Gabapentin was a "miracle drug" the Plaintiff wanted reinstated; he "threatened litigation" if it was not prescribed. Dr. Hodge examined Plaintiff and noted he was alert with clear speech and in no apparent distress. After a full examination, the doctor found, "[e]xam does not suggest indication for gabapentin, even without consideration of the patient's hx of diversion, as well as a gabapentin level of 2.4 mcgms/ml while on 3200 mg per day (7/27/11). Will allow carbamazepine to expire, secondary to side effects, and [prescribe] desiprimine as less likely to cause drowsiness; [prescribe] course of baclofen first re: muscle spasm. Schedule for trigger point injections. Discussed treatment plan, which does not include neurontin, w/ the pt, who threatens litigation." Ambulatory Health Record, September 20, 2012, docket #110-1 at 74.

49.      On November 1, 2012, Plaintiff saw PA Lousberg in response to his request "to discuss meds and further treatment options for my back problems." Plaintiff denied any new onset or change of symptoms from his prior reported symptoms, but complained that pain medications such as Elavil, Tegretol and his current medication, Norpramin, did not work for him, so he wanted Gabapentin reinstated. Plaintiff further stated he did not want trigger point injections because he felt they would not be helpful. Lousberg examined Plaintiff and noted that he was a 37-year-old, healthy looking male who ambulated well, had a normal gait, was alert and oriented and in no acute distress; his skin

was warm/pink/dry; he was well developed and well nourished; he had a good range of motion in his back; he had no spinal tenderness, no spasm, and no trigger points; he had some muscular tenderness with tnesion through lower lumbar area; his knee deep tendon reflexes were normal; and his straight leg raise was negative bilaterally. Lousberg discussed an alternative pain medication known as Pamelor with Plaintiff, who was willing to try it, though Plaintiff still wanted to be prescribed Gabapentin and indicated that he was "willing to go through hoops" to get it. Ambulatory Health Record, November 1, 2012, docket #110-1 at 76.

50.     On November 20, 2012, Plaintiff saw Dr. Hodge for a recheck of his lower back pain complaints. Plaintiff complained of sharp pains in the lumbar and inferior thoracic back from approximately T-11 to L-3 and pain radiating to his right buttock into his lower right extremity. He also complained of an achy, burning sensation in his ankles, knees, and hip joints, as well as side effects from his pain medications such as dehydration and sleepiness. Dr. Hodge conducted a complete physical examination of Plaintiff and recommended trigger point injections to address his lower back pain complaints. After discussing with Plaintiff the potential side effects of the injections, Plaintiff stated "he just wants to have the pain go away; will consent to trigger point injections." Dr. Hodge performed the injections at that time, and noted the Plaintiff tolerated the procedure well, had no apparent complications, and Plaintiff was ambulatory with a steady gait and clear speech after the procedure. Ambulatory Health Record, November 20, 2012 and Consent to Treat form, November 20, 2012, docket #110-1 at 77-79.

51.     On December 11, 2012, Plaintiff filed a grievance complaining first that despite being approved, he had not had an MRI and no medical provider would help him get one and, second, he had been denied a prescription for Gabapentin for simply "misusing" the drug and based on a year-

old blood test result.  Plaintiff requested that "DOC and CHP request, approve, and have the court-ordered treatment performed and that gabapentin medication be resumed to manage the pain as it is necessary."  Step 1 Grievance, December 11, 2012, docket # 1 at 25.

52.     PA Lousberg responded to the Step 1 Grievance on December 28, 2012 saying, "Your grievance is denied on procedural grounds. AR 850-04 states that each grievance shall address only one problem or complaint and include a description of the relief requested."  *Id.*; *see also* Ambulatory Health Record, December 31, 2012, docket #110-1 at 80.

53.     Plaintiff filed a Step 2 Grievance on January 9, 2013 essentially repeating the contents of the first grievance and arguing that it reflects one issue – denial of medical care for back injury – and cites a few instances – denial of MRI and refusal to prescribe Gabapentin.  Step 2 Grievance, January 9, 2013, docket #1 at 26.  Jill Lampela responded on January 25, 2013 addressing (in error) the response to a different offender concerning different matters.  *Id.*

54.     Plaintiff filed a Step 3 Grievance on February 7, 2013 saying he was "astounded" by the erroneous response and claimed the process was "unworkable" and unreasonable; accordingly, Plaintiff "stood" on the same issue stated in the first and second grievances and repeated his request for relief.  Step 3 Grievance, February 7, 2013, docket #1 at 27.  On March 11, 2013, Anthony DeCesaro responded saying

> In review of this matter I find that you have been evaluated by medical health providers at CSP. I cannot second guess the medical, professional opinion of those professionals regarding your diagnosis and treatment, as I am not a medical professional. Your treatment appears to be adequate and appropriate for your condition. I contacted CSP HSA Lampela for information. You were seen by a medical provider on 11/1/12 in response to your kited request for a back problem appointment. Following the exam, the provider noted that Neurontin was not indicated based on the exam as well as your history of medication abuse. In the notes, it stated you understood your plan of care. You were seen on a follow-up appointment on 11/20/12 in which the provider administered trigger point injections

for back pain. To date, there is not a record of another follow-up appointment requested by either you or the provider. Recommendations by specialists are just that, recommendations, which do not necessarily have to be followed by DOC medical. You may however request a private physician appointment at your expense, if approved, per AR 700-21. I do not find that DOC was or is deliberately indifferent to your medical condition and therefore I cannot recommend any relief in this matter.

March 11, 2013 Letter from DeCesaro to Denison, docket #1 at 28.

55.     Plaintiff was transferred to the Sterling Correctional Facility in late July 2013, then subsequently transferred to the Arkansas Valley Correctional Facility (AVCF) on or about November 27, 2013.  Martinez Affidavit, ¶¶ 158-159, docket #110-1.

56.     On November 29, 2013, PA Ted Laurence at AVCF noted Plaintiff as a "new arrival" who "is not taking any meds, yet claims he has 2 herniated disc [sic] in his back," and "claims he has litigation with this issue."  Ambulatory Health Records, November 29, 2013, docket #110-1 at 81.

57.     On December 5, 2013, Plaintiff saw PA Laurence and reported he had tried several medications for his back pain, and Neurontin "worked the best" but was discontinued due to misuse. Plaintiff also reported he was supposed to have received an MRI examination as part of a lawsuit, and that the MRI had been scheduled but canceled and never rescheduled.  Laurence examined Plaintiff and noted he appeared in no acute distress and had walked to the exam room without an obvious limp; Plaintiff had some muscle tightness in the lower lumbar region; he was able to bend at the waist but not at 90 degrees; his deep tendon reflexes were normal; and he had good muscle strength against resistance on flexion and extension of knees.  Laurence also noted the results of Plaintiff's 2006 MRI, and that an MRI had been scheduled for December 29, 2010 and "completed"; however, a "consult" on August 12, 2011 reflected the MRI had not been done "for unknown reasons" and Plaintiff stated he never got it.  Laurence also notes a September 2, 2011 request for an MRI had been denied asking for notes of a physical exam.   Laurence again prescribed

18

Gabapentin for Plaintiff, but at a substantially lower dosage of 300 mg per capsule, to be taken twice daily.  Laurence warned Plaintiff that if he was caught "cheeking" (hiding his medication in his cheek), or

removing the medication from the medline, his medication would be discontinued. Ambulatory Health Record, December 5, 2013, docket #103-1 at 82.

58.     PA Laurence made a request for approval for an MRI examination, and Plaintiff had a repeat MRI on December 16, 2013.  CHP Utilization Review form, December 10, 2013, docket #102-3 at 5; MRI Results, December 16, 2013, docket #110-1 at 83.  The results of the 2013 MRI examination reflect that Plaintiff has normal alignment of the lumbar spine; L1-2 disk is normal except for mild arthropathy; L2-3 disk is normal except for mild arthropathy; L3-4 disk is normal except for mild arthropathy; some disc desiccation at the L4-5 disk, with posterior disc protrusion compressing on the thermal sac, but not significantly effacing the CSF from around the nerve root; bilateral facet arthropathy was seen at L4-5, and there was some narrowing of the nerve root, approximately 50%; some disc desiccation at the L5-S1 disk, with disk space narrowing and posterior disc protrusion with compression on the S1 nerve roots bilaterally within the lateral recesses.  *Id.*  The radiologist found "[d]egenerative disk changes with disk desiccations at L4-5 and L5-S1, most significant at L5-S1." *Id.*

59.     On December 27, 2013, PA Laurence shared the results of the December 2013 MRI examination with Plaintiff and discussed the long-term management of Plaintiff's back pain, including the continued use of conservative measures such as stretching, medication, facet blocks, and as a last resort, surgery.  Ambulatory Health Record, December 27, 2013, docket #110-1 at 86.

60.     Plaintiff testified that the MRI findings in 2013 and those from the MRI taken in 2006 were

virtually the same: "When he read [the 2013 MRI report] off to me, it was almost verbatim of what it was in 2006." Denison Depo, 202: 3-12; 216: 16-25, docket #101-2.

61.     Although seen in the medical department for other reasons, Plaintiff had not (as of December 2014) requested appointments to address his back pain complaints with a provider since his appointment with PA Laurence during which they discussed the results of the December 2013 MRI. Martinez Affidavit, ¶ 176, docket #110-1.  Plaintiff testified that he was "over Medical. I'm over dealing with them." Denison Depo, 202: 17-18, docket #101-2.

## LEGAL STANDARDS

### I.     Treatment of a *Pro Se* Plaintiff's Complaint

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers. [The] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations and citations omitted).  The Tenth Circuit interpreted this rule to mean, "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, this interpretation is qualified in that it is not "the proper function of the district court to assume the role of advocate for the pro se litigant." *Id.*; *see also Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citing *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989)).

20

## II.      Dismissal under Fed. R. Civ. P. 56

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).  Only admissible evidence may be considered when ruling on a motion for summary judgment.  *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined.  *Celotex*, 477 U.S. at 322.  That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial.  Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation

omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir.

2002).  These specific facts may be shown "'by any of the kinds of evidentiary materials listed in

Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006,

1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).  "[T]he content of summary judgment

evidence must be generally admissible and . . .  if that evidence is presented in the form of an

affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the

evidence must be based on personal knowledge."  *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114,

1122 (10th Cir. 2005).  "The court views the record and draws all inferences in the light most

favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431

F.3d 1241, 1255 (10th Cir. 2005).

The Court is now sufficiently advised and recommends as follows.

## ANALYSIS

Here, the Plaintiff failed to file a timely response to the present motions although provided

ample time within which to do so.   However, even if the Plaintiff fails to present evidence

demonstrating an issue of material fact in response to the summary judgment motion, the Defendants

still bear the burden of demonstrating they are entitled to summary judgment as a matter of law.

*Celotex Corp.*, 477 U.S. at 323.  "Accordingly, summary judgment is 'appropriate' under Rule 56(e)

only when the moving party has met its initial burden of production under Rule 56(c)." *Murray v.

City of Tahlequah, Oklahoma*, 312 F.3d 1196, 1200 (10th Cir. 2002). "If the evidence produced in

support of the summary judgment motion does not meet this burden, summary judgment must be

denied even if no opposing evidentiary matter is presented." *Id.* (internal quotation marks and

citation omitted). "If the nonmoving party fails to respond, the district court may not grant the

motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Id.*

To meet their burdens of production required to support summary judgment, the Defendants "need only point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 674 (10th Cir. 2002) (citation omitted). "Summary judgment will then lie if the movant establishes entitlement to judgment as a matter of law given [the] uncontroverted, operative facts." *Id.* Irrelevant or unnecessary factual disputes will not be considered. *Id.*

## I.   Boyd's and Lousberg's Motion for Summary Judgment

Pursuant to Judge Brimmer's order adopting this Court's recommendation denying in part the individual Defendants' motion to dismiss, the claims remaining against the individual Defendants are alleged violations of the Eighth Amendment against Boyd and Lousberg and a breach of contract claim against Boyd. The Court will address each of the claims in turn.

### A.   Eighth Amendment Claims

Defendants assert they are entitled to qualified immunity on the Eighth Amendment claims against them in their individual capacities. Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "It is an entitlement not to stand trial or face the other burdens of litigation." *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). "The privilege is an immunity from suit rather than a mere defense to liability." *Id.*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Seifert v. Unified Gov't of Wyandotte Cnty./Kansas City*, -- F.3d --, 2015 WL 846208, *16 (10th Cir. Feb. 27, 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "When a defendant pleads qualified immunity, the plaintiff has the heavy burden of establishing: (1) that the defendant's actions violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions." *Id.* (quoting *Scott v. Hern*, 216 F.3d 897, 910 (10th Cir. 2000)). That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful ***in the situation he confronted***." *Al-Turki v. Robinson*, 762 F.3d 1188, 1194 (10th Cir. 2014) (quoting *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001)) (emphasis added). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Stewart v. Beach, 701 F.3d 1322, 1331 (10th Cir.2012) (internal quotation marks omitted).

The Supreme Court has discarded a review process that required courts to examine these questions sequentially, first considering whether a right had been violated, and then second – if the court concluded a right had been violated – whether that right was clearly established at the time of the alleged violation. *Pearson*, 555 U.S. at 232-35. *Pearson* instead affords courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

24

Here, the Court will begin by analyzing whether Defendants have demonstrated no genuine issue of material fact exists as to whether Defendants violated the Eighth Amendment, and if Defendants have not, the Court will proceed to determine whether genuine issues exist concerning whether the Plaintiff's constitutional rights were clearly established at the time of the alleged violations.

Under the Eighth Amendment, prisoners are constitutionally entitled to "humane conditions of confinement guided by 'contemporary standards of decency.'" *Penrod v. Zavaras*, 94 F.3d 1399, 1405 (10th Cir. 1996) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)). Accordingly, prison officials must "ensur[e] inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and ... tak[e] reasonable measures to guarantee the inmates' safety." *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)). Prisoners state a claim of cruel and unusual punishment under the Eighth Amendment by alleging prison officials demonstrated "deliberate indifference to a prisoner's serious illness or injury," or that prison officials "have, with deliberate indifference," involuntarily exposed a prisoner to conditions "that pose an unreasonable risk of serious damage to [the inmate's] future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Estelle,* 429 U.S. at 105.

Plaintiff must meet both the objective and subjective components constituting the test for deliberate indifference. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). "The objective prong of the deliberate indifference test examines whether the prisoner's medical condition was 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." *Al-Turki*, 762 F.3d at1192. The Tenth Circuit established "[a] medical need is considered sufficiently serious to satisfy the objective prong if the condition 'has been diagnosed by a physician as mandating

treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* at 1192-93 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)).

> Where a prisoner claims that harm was caused by a delay in medical treatment, he must "show that the delay resulted in substantial harm" in order to satisfy the objective prong of the deliberate indifference test. "We have held that the substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001). Thus, the "substantial harm" caused by a delay in treatment may be a permanent physical injury, or it may be "an intermediate injury, such as the pain experienced while waiting for treatment and analgesics." *Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir. 2006). "Although 'not every twinge of pain suffered as a result of delay in medical care is actionable,' when the pain experienced during the delay is substantial, the prisoner 'sufficiently establishes the objective element of the deliberate indifference test.'" *Id.* (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)).

*Id.* at 1193.

The subjective component is met if the Plaintiff demonstrates Defendants "knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan*, 471 F.3d at 1159 (quoting *Kikumura*, 461 F.3d at 1293). The subjective component requires an "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." *Kikumura*, 461 F.3d at 1293 (quoting *Farmer*, 511 U.S. at 838). This component is equivalent to "criminal recklessness, which makes a person liable when she consciously disregards a substantial risk of harm." *Beauclair v. Graves*, 227 F. App'x 773, 776 (10th Cir. 2007) (quoting *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005)). "A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [the] condition." *Mata*, 427 F.3d at 755.

      1.    Boyd

Early in the litigation, Judge Brimmer adopted this Court's recommendation to dismiss

Plaintiff's Eighth Amendment claim against Boyd alleging she failed to schedule an MRI in February 2011, failed to follow up scheduling an MRI in August 2011, failed to comply with the settlement agreement (insofar as he alleged deliberate indifference), and failed to reinstate the prescription for Gabapentin.   However, the District Court also allowed Plaintiff's Eighth Amendment claim against Boyd, alleging she was deliberately indifferent in August 2012 to requesting an MRI recommended and approved for Plaintiff's back problem, to proceed in the litigation.

Specifically, Plaintiff alleges that (1) Boyd knew about the previously approved MRI; (2) she previously had agreed to schedule the MRI presumably understanding that it had been approved and scheduled, but never conducted due to a calendaring error; (3) the Plaintiff reminded her in August 2012 that the MRI was never conducted; and (4) the Plaintiff still suffered the same or worse back pain at that time.

Regarding the objective component, Boyd contends that simply because a Physician's Assistant ordered an MRI in July 2010 based on Plaintiff's subjective complaints of back pain, and Boyd subsequently sought approval for such MRI in August 2011 because it was not performed, does not establish that there was a serious medical need for an MRI at that time, or thereafter.

The Court rejects this reasoning; the question is not whether Plaintiff's need for an MRI was serious, but whether his "medical condition was 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." *Al-Turki*, 762 F.3d at1192.  The Court determined in adjudicating Boyd's motion to dismiss that Plaintiff demonstrated his back pain, which he has had since at least 2004 and for which he has supplied evidence of medical evaluations and treatment, constitutes a sufficiently serious condition "that has been diagnosed by a physician as mandating

treatment." *See* Recommendation and Order, dockets ## 59 and 64; *see also Sealock*, 218 F.3d at 1209.   Moreover, the record reflects that over the course of years of reported significant pain, medical providers increased his pain medication to the daily maximum allowable dosage; certainly, this evidence of substantial pain over a prolonged period suffices to meet the Tenth Circuit's requirements. *See Al-Turki*, 762 F.3d at 1193.   Boyd does not dispute this evidence; accordingly, the Court finds Plaintiff has met the objective prong and will proceed to determine whether genuine issues of material fact exist as to whether Boyd "knew she faced a substantial risk of harm and disregarded that risk." *Callahan*, 471 F.3d at 1159.

Boyd argues that she did not appeal the denial of her request for an MRI in 2011 because "she did not feel that she could provide additional notes or a physical exam sufficient to justify the request for an MRI"; however, any claim that Boyd failed to order the MRI in 2011 has been dismissed (and, now, would likely be dismissed given the unrebutted evidence that Boyd did, in fact, seek approval for the MRI in August 2011).   Further, Boyd contends that "based on her own observations of Plaintiff during her interactions with him" – which, according to the record, would have been from April 2011 through August 2012 – "she did not feel that she could justify a request for an MRI because in her own judgment, one was not medically necessary." Motion, docket #103 at 22.   Accordingly, the question before the Court is whether genuine issues exist as to whether Boyd disregarded a substantial risk of harm by determining an MRI was not medically necessary in August 2012.

It is undisputed in this case that an MRI examination is not a form of treatment but, rather,

a diagnostic tool to determine proper treatment of a medical problem.[4]   The record reflects that, as of August 2012, Plaintiff's last MRI of his spine was taken in 2006; since that time, he had received treatment in the form of facet block injections which "lasted a few days" (Progress Note, docket #110-1 at 42), trigger point injections which "caused [Plaintiff's] spine to pinch the nerve even more, and it caused more pain" (Denison Depo: 170: 17-25, 171: 1-7), and pain medication. Plaintiff has claimed that medications other than Gabapentin/Neurontin were "not effective" (Step 1 Grievance, docket #1 at 25), but that Gabapentin was a "miracle drug" for his pain (Ambulatory Health Record, docket #110-1 at 74).

On August 6, 2012, at which time Boyd allegedly denied Plaintiff's request for approval of the MRI, Plaintiff had been off of the Gabapentin (maximum daily dosage) for a total of seven days after it was discontinued on July 30, 2012 (AHR, docket # 110-1 at 70) and Plaintiff "ambulated to medical dept with steady gait[;] he is in no apparent distress" (AHR, docket #110-1 at 71).   In fact, Boyd had previously seen the Plaintiff on three other occasions since April 2011 (AHR, docket 110-1 at 60, 61, and 65), during which time she also noted his steady gait, his ability to get out of bed "easily," and that he was in no apparent distress.   Further, Boyd reviewed Plaintiff's medical chart on another three occasions (AHR, docket 110-1 at 57, 62, and 63), which reflects he was playing soccer (docket #110-1 at 53) and basketball (docket #110-1 at 49) in 2010 without complaint of back pain.

---

[4]Notably, neither Dr. Koons' staff nor the Plaintiff explain why the MRI was ordered or necessary in July 2010, except for Plaintiff's vague statement that Dr. Koons required it to proceed with treatment.  However, no such treatment is identified by Dr. Koons' staff (*see* docket #110-1 at 52) or by the Plaintiff; in fact, the Progress Note from Dr. Koons' office provides, "[Plaintiff] will return in 30 days for *reevaluation*" implying that no treatment, other than the medication prescribed, was anticipated pending review of an MRI.  *See id.* (emphasis added).

Accordingly, the evidence demonstrates that when Boyd saw Plaintiff in August 2012 after he was *off* the Gabapentin for seven days, he appeared to be no different (and certainly no worse) than the previous occasions when he was *on* the Gabapentin with a steady gait and in no apparent distress. Considering this unrebutted evidence, which was (appropriately) not before the Court at the motion to dismiss stage, the Court finds no genuine issue of material fact demonstrating that Boyd disregarded a substantial risk of harm to the Plaintiff in August 2012. Therefore, the Plaintiff's Eighth Amendment claim fails and this Court recommends finding that Boyd is entitled to qualified immunity as to this claim.

### 2.   Neal Lousberg

Judge Brimmer adopted this Court's recommendation to dismiss Plaintiff's Eighth Amendment claim against Lousberg alleging alleging he failed to schedule an MRI and failed to comply with the settlement agreement. However, the District Court also allowed Plaintiff's Eighth Amendment claim against Lousberg, alleging he was deliberately indifferent in July 2012 when he discontinued the Gabapentin prescribed for Plaintiff's back problem, to proceed in the litigation.

Specifically, Plaintiff alleges (1) he told Lousberg on May 31, 2012 that the nurse was not bringing his medication to visits; (2) Lousberg advised Plaintiff to "kite" the nurse for this problem; (3) then on July 30, 2012, Lousberg discontinued the medication for Plaintiff's "hoarding" despite knowing that the nurse was not bringing Plaintiff his medication. Complaint, ¶¶ 14-15, docket #1 at 7. Plaintiff alleges that Gabapentin had been prescribed before he arrived at the CSP and was effective when taken in conjunction with Baclofen as prescribed. *Id.*, ¶ 11. The allegations reveal that, after Lousberg discontinued the Gabapentin, Plaintiff suffered "great pain from nerve damage." *Id.*, ¶ 27.

Lousberg argues that, "at best, the facts [ ] demonstrate only that Plaintiff disagreed with the treatment provided to him."   Motion, docket #103 at 24.   Lousberg contends that the objective component is not met because the evidence does not demonstrate Plaintiff had a serious medical need for the Gabapentin, and the subjective component is not met because the evidence demonstrates Lousberg discontinued the Gabapentin because Plaintiff was caught hoarding it and it was not essential for Plaintiff's condition.

Again, Lousberg misinterprets the Tenth Circuit's standard for the objective component of an Eighth Amendment claim.   Plaintiff need not demonstrate a serious need for Gabapentin, but that his back problem is "'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause."   The Court has already determined that Plaintiff meets this prong of the test.

As for the subjective component, the Court must determine whether genuine issues of fact exist as to whether Lousberg knew he faced a substantial risk of harm and disregarded that risk when he discontinued the medication.   A record from May 31, 2012 indicates that Plaintiff saw Lousberg in response to Plaintiff's kite seeking "to discuss problems with medication."   Lousberg notes that Plaintiff reported he "wants dose [of Gabapentin] increased, states thinks higher dose would be more effective than current one, states is helping with his back pain/sciatica, denies any problems taking AD. Pt denies any new onset or change in back [symptoms] from previous. Pt has no other [complaint] at this time."   AHR, docket #110-1 at 68.   Lousberg granted Plaintiff's request and increased the Gabapentin to the maximum daily allowable dosage.   *Id.*   Notably missing from this report is any mention of Plaintiff's complaint that nurses had withheld or failed to provide Plaintiff's medication; the first mention of such accusation is on July 29, 2012 (docket #110-1 at 69) when he is supposedly "caught hoarding" the Gabapentin.   After that date, Plaintiff makes the accusation

about the nurses not providing his medication on several occasions to several providers, including Lousberg on November 1, 2012. *See* AHR, docket #110-1 at 76. At that time, Lousberg notes that he had checked Plaintiff's EMAR "for the month of 7/12, did not miss a single dose during that month, pt took every dose AM & PM." *Id.* With this information, Lousberg determined on July 30, 2012 not only that Plaintiff had "admitted" to hoarding the Gabapentin, but also that the medication was "not essential," and discontinued the medication. AHR, docket #110-1 at 70.

Notably, the record does not indicate any observations or examinations of Plaintiff by providers reflecting he was in "greater" or "more severe" pain after July 2012: on August 6, 2012, NP Boyd observed Plaintiff having "ambulated to medical dept with steady gait[;] he is in no apparent distress (docket #110-1 at 71); on August 22, 2012, Dr. Weinpahl observed that Plaintiff "did not appear in sig[nificant] pain" (docket #110-1 at 72); on September 20, 2012, Dr. Hodge observed Plaintiff "alert w/ clear speech; no apparent distress" (docket #110-1 at 73); and on November 1, 2012, PA Lousberg observed Plaintiff as a "healthy looking male [who] ambulates well, normal gait ... back with good ROM [range of motion]" (docket #110-1 at 76). In fact, during Plaintiff's examination by Dr. Hodge, the doctor determined "[e]xam does not suggest indication for gabapentin, even without consideration of the patient's [history] of diversion, as well as a gabapentin level of 2.4 mcgms/ml while on 3200 mg per day (7/27/11)." AHR, docket #110-1 at 73.

Here, the Court must agree that the evidence establishes only that Plaintiff disagreed with Lousberg's decision to discontinue his Gabapentin, not that Lousberg disregarded a substantial risk of harm in discontinuing the medication. A difference of opinion about the course of medical treatment will not constitute an Eighth Amendment violation. *Scott v. Gibson*, 37 F. App'x 422, 423

32

(10th Cir. 2002) (plaintiff's "assertions amounted only to a difference of opinion as to the need for medical ... treatment or the adequacy of any treatment, [therefore] Defendants' acts did not constitute deliberate indifference"); *Self*, 439 F.3d at 1231 ("a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation"); *Estelle*, 429 U.S. at 107 (plaintiff who "suggest [ed] a number of options that were not pursued," when he saw medical personnel on seventeen occasions and was given medication to treat his high blood pressure and back pain, did not state an Eighth Amendment claim for deliberate indifference).

Accordingly, the Court concludes that no genuine issues of material fact exist as to whether Lousberg violated Plaintiff's Eighth Amendment rights, and recommends that the District Court find Lousberg is entitled to qualified immunity and summary judgment on this claim.

B.      Breach of Contract Claim

After finding the Court had jurisdiction to hear Plaintiff's breach of contract claim alleging Defendants failed to comply with the February 24, 2009 settlement agreement in refusing to schedule the previously approved MRI, Judge Brimmer allowed the claim to proceed against NP Boyd.  Under Colorado law, to prove a breach of contract claim, a plaintiff must establish the following elements: (1) the existence of a contract; (2) plaintiff's performance or some justification for nonperformance; (3) defendant's failure to perform; and (4) resulting damages to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).  In this case, there exists a contract (settlement agreement) between the Plaintiff and the CDOC (docket #1 at 18-19); *see also* Final Release and Settlement Agreement, March 31, 2009, ¶ 15(a), docket #101-8.  Plaintiff contends Boyd breached paragraph 4 (15(a)) in refusing to seek approval for the MRI in August 2012:

> The parties agree that Plaintiff will receive a priority appointment with Dr. Koons for a medical evaluation relating to his back problems. The parties further agree that

if Dr. Koons recommends that Plaintiff receive another round of facet block injections, Defendants will approve that treatment. The parties further agree that Plaintiff will receive a priority follow-up appointment with Dr. Koons for further evaluation relating to his back problem. If Dr. Koons recommends additional medical treatment at that time, Plaintiff will pursue a request for such treatment through ordinary CDOC channels.

*Id.*

There is no dispute here that Plaintiff performed his part of the agreement – *i.e.*, that he released his claims then pending in the related lawsuit. Rather, Boyd argues that the CDOC already fully performed its obligations under the Settlement Agreement in 2009, and there was no promise to provide Plaintiff with an MRI examination in August 2012 nor any other time. Motion, docket #103 at 16. At the motion to dismiss stage, this Court found that the language of the agreement may be construed as Defendants' obligation to provide Plaintiff with initial and follow-up "medical evaluations," and since an MRI is a diagnostic technique that is typically used to evaluate a patient, the agreement may be construed as providing for an MRI so long as it is deemed necessary by the doctor.

Here, the evidence reflects Plaintiff saw Dr. Koons again in May 2009 at which time the doctor neither ordered an MRI nor facet block injections (as anticipated by the settlement agreement) but, rather, determined to proceed with a facet rhizotomy and to schedule epidural injections. Office Visit Notes, docket #110-1 at 42. Another record from Dr. Koons office has handwritten notes stating, "schedule facet rhizotomy under local ... schedule 3 epidurals here in office." Docket #110-1 at 45. Apparently, "April" in Dr. Koons office then sent a CDOC Referral/Precertification Request Form to CHP seeking approval of the rhizotomy and epidurals on August 5, 2015 (docket #110-1 at 46); two days later, on August 7, 2009, April sent a Fax Cover Letter to CHP saying, "here is what I have in his chart[;] I did not seen an MRI or CT report that you

34

asked for."  Docket #110-1 at 44.  CHP denied the request on August 11, 2009 saying, "[t]he information provided does not support the medical necessity for the service requested."  Docket #110-1 at 47.  There is no indication in the docket that Dr. Koons appealed CHP's determination.

Plaintiff saw Dr. Koons again for a follow-up appointment in July 2010; the written record notes that "we will get an MRI of the lumbar and sacral vertebrae" and "we will increase the Neurontin to 600 mg b.i.d."  Docket #110-1 at 52.  The only "treatment" ordered by Dr. Koons at the follow-up appointment was an increase in medication, which was honored by the CDOC.  Docket #110-1 at 53.  However, pursuant to CDOC policies, it was incumbent upon the doctor to seek approval for the MRI (docket #1 at 23); his office did not do that until November 4, 2010 (docket #110-1 at 54).  CHP approved the MRI (docket #102-3 at 3) and it was scheduled to take place December 29, 2010.  According to the Plaintiff, the MRI examination did not occur that day because of a scheduling mix-up.  Complaint, ¶ 7, docket #1.

At this point, the Court must agree that no genuine dispute of material fact exists as to whether Boyd fulfilled her obligations under the settlement agreement.  The agreement provided that Plaintiff would receive a priority appointment with Dr. Koons; he received such appointment on May 29, 2009.  The agreement provided that *if* Dr. Koons ordered additional facet block injections, the CDOC would approve them; Dr. Koons noted Plaintiff's report that the "block lasted a few days," so determined to proceed with different treatment.  The agreement provided that Plaintiff would receive a follow-up appointment with Dr. Koons for further evaluation; Plaintiff received the appointment on July 9, 2010.  At that time, Dr. Koons' nurse stated they would treat Plaintiff by increasing the dosage of Neurontin, which the CDOC honored, and "get an MRI" presumably to evaluate the Plaintiff; however, the office did nothing further to get the MRI approved until

November 2010 at which time CHP approved the MRI. For reasons unrelated to Boyd or her conduct, the MRI did not occur when scheduled, and there is nothing in the record demonstrating that Dr. Koons or his staff followed up with obtaining that evaluation.

In fact, it was Boyd who followed up and attempted to get the MRI rescheduled in August 2011; however, by that time, CHP had already approved the MRI in November 2010 for Dr. Koons and requested "notes with a physical exam" from Boyd at CSP for her request. *See* docket #102-3 at 4. Boyd felt that, based on her observations of Plaintiff, there was nothing more she could do regarding seeking an MRI for him, and could not justify an additional request for an MRI on her own. Boyd Affidavit, ¶ 47, docket #103-3. By the following year, August 2012, Boyd had seen Plaintiff and reviewed his chart on numerous occasions and determined an MRI was not medically necessary. *Id.*, ¶ 69. The Tenth Circuit has held that the "subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his medical judgment." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006). Importantly, from November 2010 to August 2012, there is nothing in the record reflecting that Dr. Koons still needed or requested an MRI. Accordingly, Boyd's conduct does not demonstrate any breach of the settlement agreement from 2009.

Further, Defendants argue that Plaintiff fails to demonstrate damages from any lack of an MRI. Once again, the Court agrees. The evidence reflects that Plaintiff eventually underwent an MRI examination in 2013 for which the results were nearly identical to those of the MRI taken in 2006. Plaintiff testified that the MRI findings in 2013 and those from the 2006 MRI were virtually the same: "When he read [the 2013 MRI report] off to me, it was almost verbatim of what it was in 2006." Denison Depo, 202: 3-12; 216: 16-25, docket #101-2. Following the 2013 MRI, Medical

determined to *continue* with conservative treatments such as stretching and medication. Docket #110-1 at 86. Accordingly, the Plaintiff cannot show that he was damaged by Boyd's refusal to seek approval for an MRI for him in August 2012.

Consequently, Boyd has established that no genuine issues of material fact exist showing that she breached the 2009 settlement agreement when she refused to seek approval for an MRI for the Plaintiff in August 2012. This Court respectfully recommends that the District Court find summary judgment in favor of Boyd on Plaintiff's breach of contract claim.

**II.     CHP's Motion for Summary Judgment**

Plaintiff alleges CHP failed to respond appropriately, or at all, to the settlement agreement[5] and denied or delayed treatment for a serious medical need when it failed to approve the requests for an MRI. Complaint, ¶ 8, docket #1. Plaintiff testified as to the basis for his claim against CHP:

A       So to answer your question, the first -- the first request for the MRI was approved in November [2010], because Dr. Koons sent his notes in. I was never given that MRI. And whether it was because the Scheduler messed up, or for whatever reason, it's kind of irrelevant. But the second request for the MRI --

Q       And so that the record is clear, you're talking about the 2011 Request, right?

A       Right.

Q       Okay.

A       The second Request should have been approved on the same notes for Dr. Koons. They asked for notes from CSP, and, of course, they didn't have notes for that, because they're relying on the fact that it had already been

---

[5]It is undisputed in this case that CHP was not a party to the settlement agreement between the Plaintiff and the CDOC and, thus, the Court cannot liberally construe the Complaint to assert a breach of contract claim against CHP. *See* Settlement Agreement, docket #101-8; *see also Gorab v. Equity Gen. Agents, Inc.*, 661 P.2d 1196, 1198 (Colo. App. 1983) (insurance agent not a party to insurance contract and not bound by duties created under the contract).

approved.

Denison Depo, 155: 7-21; *see also id.*, 151: 8-21; 194:1-10.  In essence, then, Plaintiff claims that CHP violated his Eighth Amendment rights when it denied the August 2011 request for approval of an MRI in September 2011.

Here, with respect to Defendant CHP (formerly, "PHP"), "[t]he established principles of municipal liability have been found to apply to § 1983 claims brought against private corporations like Defendant PHP." *Rhodes v. Physician Health Partners (PHP)*, No. 09-cv-00482-REB-KLM, 2010 WL 728213, at *5 (D. Colo. Feb. 24, 2010) (citing *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003)).  "Therefore, according to the principles of municipal liability, a private actor such as [CHP] 'cannot be held liable solely because it employs a tortfeasor – or, in other words ... cannot be held liable under § 1983 on a *respondeat superior* theory.'"  *Id.* (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). "In order to be held liable for the alleged tortious acts of its agents, Plaintiff must show that [CHP] directly caused the constitutional violation by instituting an 'official municipal policy of some nature,' that was the 'direct cause' or 'moving force' behind the constitutional violations."  *Id.* (quoting *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 944 (10th Cir. 2005)).  "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Id.* (quoting *Bd. of Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997)).

> To impose liability, the alleged policy must be a "policy statement, ordinance, regulation or decision officially adopted and promulgated" by the public entity's officers. *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (internal quotation marks and citation omitted). "If a violation cannot be characterized as official policy, then [a municipality may] still be held liable if the practice is so permanent and well-settled as to constitute a custom or usage with the force of law."

> *Id.* (internal quotation marks and citations omitted). A custom has been interpreted to mean "an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157,1177 (10th Cir. 2003) (citation omitted).

*Id.* Moreover, an entity cannot be held liable absent unconstitutional conduct by its representatives. *Graves v. Thomas*, 450 F.3d 1215, 1225 (10th Cir. 2006).

In this case, the Plaintiff has identified no "official policy" in the form of a "policy statement, ordinance, regulation or decision officially adopted or promulgated" that was the direct cause of the constitutional violation.  Further, Plaintiff describes no "practice" by CHP that "is so permanent and well-settled as to constitute a custom or usage with the force of law."  Finally, Plaintiff does not name any CHP employee, or anyone associated with CHP, in this action and, thus, the Court has not found any unconstitutional conduct by any representative of CHP.  *See Graves*, 450 F.3d at 1225; *see also Clark v. Colo. Dep't of Corrs.*, No. 04-cv-02414-LTB, 2008 WL 4724126, at *12 (D. Colo. Oct. 24, 2008) (finding summary judgment in favor of PHP for the plaintiff's failure to identify a custom, policy, practice or employee responsible for the constitutional violation).

Even if Plaintiff had identified a custom, policy or practice or named a CHP representative in this action, however, the Court finds no triable issues of fact concerning whether CHP violated Plaintiff's Eighth Amendment rights.  No evidence suggests that, in denying approval for the MRI in September 2011, CHP disregarded a substantial risk of harm to the Plaintiff.  The request itself reflects that Boyd sought approval simply because the MRI had been previously approved and not conducted.  Docket #110-1 at 64.  There is nothing in the request stating an urgent or significant need for the MRI  and nothing reflected in the record demonstrating that CHP was made aware of or knew of any risk of harm in September 2011.  In fact, Dr. Koons had ordered the MRI more than a year earlier and CHP approved that request approximately 10 months earlier; CHP requested

additional information regarding the August 2011 request, but it was never supplied. Denison Depo, 180: 5-16. Importantly, there is nothing in the record reflecting that Dr. Koons followed up or sought another MRI after November 2010.

Consequently, this Court finds CHP has demonstrated that no genuine issues of material fact exist concerning Plaintiff's claim against them for violation of the Eighth Amendment, and recommends that the District Court find summary judgment in favor of CHP in this case.

## CONCLUSION

In sum, the Court finds that Boyd and Lousberg have established no triable issues of material fact exist as to Plaintiff's claims against both of them for Eighth Amendment violations and against Boyd for breach of contract. Likewise, CHP has demonstrated the existence of no triable issue of material fact as to Plaintiff's claim against it for an Eighth Amendment violation.

Accordingly, based upon the foregoing and the entire record herein, this Court respectfully RECOMMENDS that Defendant Correctional Health Partners' Motion for Summary Judgment [filed December 5, 2014; docket #101] and the Motion for Summary Judgment filed by Defendants Boyd and Lousberg ("CDOC Defendants") [filed December 5, 2014; docket #103] be **GRANTED** in this case.

Respectfully submitted and dated at Denver, Colorado, this 18th day of March, 2015.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

40